IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RED STAR MORTGAGE CORPORATION,** | **CIVIL ACTION** |
| Plaintiff, | |
| v. | |
| **ALLEN BRANCH, BRANCH REALTY COMMERCIAL ADVISORS, XACATTACK, LLC, THOROFARE CAPITAL, INC., RICHARD RICK JAMARILLO, MICHAEL BRANCH, and BRANCH REALTY LLC,** | **NO. 15-6757** |
| Defendants, | |
| v. | |
| **DAVID DURAN and STEVE DURAN,** | |
| Third-Party Defendants. | |

## MEMORANDUM OPINION

This case arises from the refinancing of the mortgage loan on a financially distressed shopping center. Plaintiff Red Star Mortgage Corporation contends that it is entitled to payment for arranging the refinancing because it introduced the lender, Defendant Thorofare Capital, Inc., to Defendant Allen Branch, who was allegedly working on behalf of the shopping center's owner, Railyard Properties, LLC. Plaintiff seeks to recover its payment based on claims of breach of contract, unjust enrichment, *quantum meruit*, and conversion against Defendants Allen Branch and Richard "Rick" Jaramillo (a member of Railyard Properties, LLC),[1] as well as claims for unjust enrichment, *quantum meruit*, conversion, and tortious interference with contractual relations against Defendant Thorofare Capital, Inc.. All three Defendants have filed motions for summary judgment in which they contend that Allen Branch was not acting on behalf of

---

[1] Plaintiff also asserted the same four claims against Xacattack, LLC (f/k/a Renaissance Properties, LLC), Branch Realty Commercial Advisors, Michael Branch, and Branch Realty LLC. Plaintiff was granted default judgment on those claims on August 16, 2016 (with respect to Xacattack, LLC and Branch Realty Commercial Advisors) and October 6, 2016 (with respect to Michael Branch and Branch Realty LLC). *See* ECF Nos. 95 and 113.

Railyard Properties, LLC when he was introduced to Thorofare, and Thorofare's motion also seeks summary judgment on its a cross-claim and third-party claims seeking indemnification, attorneys' fees, and costs from Railyard's three principle members: Jaramillo, and Third-Party Defendants Steven Duran and David Duran. All three motions shall be granted.

## I. BACKGROUND[2]

Plaintiff's claims arise from the 2014 refinancing of a mortgage loan on Market Station at the Santa Fe Railyards ("Market Station"), a financially troubled shopping center in Santa Fe, New Mexico. Before describing the events that led to the refinancing, it is useful to first describe the people and entities involved in this case:[3]

- *Railyard Properties LLC ("Railyard")*[4] is a limited liability company formed in April 2004 by Allen Branch, Rick Jaramillo ("Jaramillo"), Steve Duran, David Duran, and Marco Gonzales which has owned Market Station since its creation, and which declared Chapter 11 bankruptcy in 2015. J.A. 47.

- *Defendant Xacattack LLC, f/k/a Renaissance Properties, LLC ("Renaissance")* is a limited liability company of which Allen Branch was the managing member at all relevant times, which has no affiliation with Railyard and owns no portion of Market Station. J.A. 180; Allen Branch Aff. ¶ 10.

- *Defendant Allen Branch* was a founding member of Railyard who sold his voting and principle membership interest in Railyard in 2012. J.A. 147, 180.

---

[2] Plaintiff has objected to numerous documents in the Joint Appendix as inadmissible, including several affidavits and declarations from Defendants, as well as business records that are not formally authenticated. However, it is well-established that a party need not produce evidence in a form that would be admissible at trial at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Rather, Rule 56 permits a motion for summary judgment to be supported by "depositions, documents, electronically stored information, *affidavits or declarations*, stipulations (including those made only for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Objections that a fact is not supported by admissible evidence require a showing that the fact could not be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). Since Plaintiff has offered no reason that any particular business records in the Joint Appendix could not be authenticated, nor that Defendants would not be able to offer trial testimony matching their declarations and affidavits, Plaintiff's objections to the materials in the Joint Appendix are overruled.

[3] The roles of Defendants Michael Branch, Branch Realty Commercial Advisors, and Branch Realty LLC – against whom default judgment has been entered – are not described with any detail in the summary judgment record.

[4] Railyard was originally named as a Defendant in this case, but Plaintiff elected to drop it from the case in light of the automatic litigation stay associated with Railyard's Chapter 11 bankruptcy proceeding.

- *Defendant Richard "Rick" Jaramillo ("Jaramillo")* is founding member of Railyard who remained a principle member at all relevant times.  J.A. 127, 236.

- *Third-Party Defendants Steve Duran and David Duran (the "Durans")* are founding members of Railyard who remained members at all relevant times.  J.A. 127, 236

- *Defendant Thorofare Capital, Inc. ("Thorofare")* is a private equity firm that re-purchased the original mortgage loan on Market Station in late 2014.  J.A. 241.

- *Plaintiff Red Star Mortgage Corporation ("Red Star")* is a real estate financial services company that attempted to arrange refinancing for Market Station through negotiations with Allen Branch and Jaramillo in 2012, and again with Allen Branch alone in 2013 at which time Red Star introduced him to Thorofare.  J.A. 169-70; 180-200.

A. **Original Financing of Market Station**

In 2008, Railyard obtained a $14,000,000 loan from Market Street Railway Properties, LLC ("MSRP"), a subsidiary of Ambit Funding, LLC ("Ambit"), to finance the development of Market Station in the historic railyard section of Santa Fe (the "MSRP/Ambit loan").  J.A. 95. Allen Branch, Steve Duran, and Jaramillo signed the loan documents on behalf of Railyard, and the loan was jointly guaranteed by Allen Branch, David Duran, Elaine Duran (David's wife), Steve Duran, and Jaramillo, pursuant to a Commercial Guaranty with MSRP.  J.A. 95, 123.

Although Railyard secured Recreational Equipment, Inc. ("REI"), a retailer of outdoor recreational equipment and apparel, to serve as anchor tenant for Market Station, many of the other units remained unleased and Railyard soon had difficulty meeting its debt obligations to MSRP.  Meanwhile, Railyard suffered from internal disputes among its members, including a lawsuit filed by Allen Branch against the company in late 2010.  J.A. 140.  In an attempt to resolve their dispute, Railyard purchased Allen Branch's voting interest and all but 5% of his membership interest on May 12, 2012.  J.A. 145.

3

### B. Red Star Solicits Railyard for Refinancing

Despite selling his membership interest, Allen Branch continued to work with Railyard as its realtor and in efforts to obtain refinancing of the MSRP/Ambit loan throughout 2012. In September of that year, Allen Branch made his first contact with Red Star by responding to a mass e-mail advertising Red Star's financial consulting and brokerage services. J.A. 169. Although he was no longer a voting or principle member of Railyard at the time, he referred to the Market Street property as "our" property and expressed an interest in refinancing "our" loan in his correspondence with Gary Polao, the President of Red Star. J.A. 169. By October 2012, Allen Branch included Jaramillo (who remained a principle member of Railyard) on several e-mail chains to provide further information about Market Station's refinancing potential, and general terms regarding potential refinancing of the MSRP/Ambit loan were discussed. J.A. 356. These negotiations culminated with a conference call between Polao, Allen Branch, and Jaramillo on October 30, 2012. J.A. 356. No formal financing proposal ever emerged from the negotiations, however, and although Allen Branch and Polao continued to exchange sporadic e-mails suggesting various alternative financing options for several months, the negotiations stopped in March 2013. J.A. 170, 173.

### C. Allen Branch / Renaissance Engage with Red Star

In the same month that the initial negotiations with Red Star stopped (March 2013), Allen Branch was terminated as Railyard's realtor. Branch Aff. ¶ 5; By May 2013, he stopped all contact with Railyard other than through his lawsuit against the company. Branch Aff. ¶ 7; Jaramillo Aff. ¶ 12; S. Duran Aff. ¶ 9; D. Duran Aff. ¶ 9.[5]

---

[5] Plaintiff has objected to the declarations attached to Jaramillo's, Steve Duran's, and David Duran's motions for summary judgment, as well as the declaration of Thorofare's Co-President Brendan Miller, which was included in the Joint Appendix. J.A. 388. While Rule 56 expressly authorizes the use of affidavits or declarations to support a motion for summary judgment, *see* Fed. R. Civ. P. 56(c)(1)(A), a court may exercise its discretion to disregard

In late July 2013, Allen Branch – now estranged from Railyard – resumed his e-mail discussion about Market Station with Polao. J.A. 173. These renewed discussions quickly yielded a formal "Agreement for Financial Services" (the "Red Star Agreement"), dated August 7, 2013, between Red Star as the "Consultant" and "Allen Branch and Renaissance Properties, LLC" as the "Client." J.A. 180. Allen Branch signed the Red Star Agreement twice (once as an individual and once as the "managing member" of Renaissance), and Polao signed on behalf of Red Star; neither Railyard nor any of its other members are mentioned in the document. J.A. 180. For his part, Jaramillo does not appear on any of the July and August 2013 e-mails between Allen Branch and Polao, and he claims he had no contact with Polao after July 2013. Jaramillo Aff. ¶ 9.

The Red Star Agreement provided that Red Star would serve as the consultant to find a lender and facilitate a $9,000,000 loan to finance Renaissance's re-purchase of the MSRP/Ambit loan on the Market Station property. J.A. 180. In return for a successful financing, Red Star would be entitled to a commission of 1.5% of the loan principal, in addition to a $2,995 consulting fee. J.A. 180. The Red Star agreement contained a clause which provided that:

> Client agrees not to obtain financing from Lender/Investors supplied by Consultant, either directly or through third parties, without prior written consent of Consultant, for a period of two (2) years from the date of this agreement except through Consultant and that a separate agreement shall be required for these services.

---

"sham" affidavits at the summary judgment stage when an affidavit or declaration contradicts earlier testimony, is "entirely unsupported by the record and directly contrary to other relevant testimony," or was prepared solely to dispute a fact that is supported by other competent evidence. *See Daubert v. NRA Grp., LLC*, 861 F.3d 382, 392 (3d Cir. 2017); *see also Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) ("A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."). Plaintiff has not shown that Defendants' affidavits and declarations are contradicted by other evidence or are otherwise a "sham." Rather, the affidavits provide the only account in the record of several material facts and are otherwise consistent with Defendants' material factual contentions contained elsewhere in the record. The Court shall therefore decline to exclude these documents from consideration under the sham affidavit doctrine. Furthermore, although Jaramillo, Steve Duran, and David Duran failed to comply with the Court's policies and procedures regarding supplements to the Joint Appendix, the Court shall consider their submissions in light of their *pro se* status.

(the "Non-Circumvention Clause"). J.A. 180.

The same day the Red Star Agreement was signed, Polao contacted Eugene Rutenberg, a Senior Loan Analyst at Thorofare, and introduced Allen Branch as the "borrower" and "managing member of Renaissance Properties, LLC" in relation to proposed financing for the re-purchase of a commercial loan. J.A. 181, 199. That same day, Polao, Allen Branch, and Rutenberg held a conference call to discuss the financing. J.A. 180, 390. Following the call, Rutenberg e-mailed Polao that Thorofare would consider the loan only if Renaissance obtained $2-3 million in secondary financing from MSRP/Ambit, and that the proposal needed "a lot of work." J.A. 200. Polao passed this information along to Allen Branch the following day, along with a Proof of Funds from Thorofare to facilitate negotiations with MSRP/Ambit. J.A. 201. There is no evidence of any further communication between Red Star, Thorofare, and Allen Branch, no formal proposal or term sheet was produced, and Renaissance never purchased the MSRP/Ambit loan. J.A. 390.

Although Polao claims that he informed Rutenberg that Red Star had a consulting agreement with Renaissance during a phone call in August 2013, the Red Star Agreement was not attached to any of the e-mails in the record between Red Star and Thorofare. Polao Aff. ¶ 14; J.A. 181-200. There is also no evidence that Allen Branch communicated with any Thorofare employees other than Rutenberg, who left Thorofare in July 2014. J.A. 389.

### D. Railyard Arranges Financing Directly with Thorofare

Nearly a year after Allen Branch's brief negotiation with Thorofare on behalf of Renaissance, Railyard itself began an urgent search for alternative funding to refinance the MSRP/Ambit loan, which was then in default. In August 2014, Jaramillo contacted Thorofare, which he claims he first discovered in a regional real estate finance publication in June 2014, to

discuss the possibility of refinancing the Ambit/MSRP loan. J.A. 214; Jaramillo Decl. at 3. By that time, Rutenberg (Allen Branch's only point of contact at Thorofare) had left Thorofare, and Jaramillo's initial point of contact at Thorofare was William Lanting, who sought guidance on the proposed transaction from Senior Vice President of Origination William Hyatt. J.A. 214. Thorofare initially presented Railyard with a proposed term sheet for a $10.5 million loan for refinancing, which was eventually re-worked as a loan re-purchase by Thorofare. J.A. 221, 229. The term sheet reflecting this revised structure provided that Railyard "represents and warrants that neither it, Borrower [a special-purpose entity set up to receive the loan], nor any affiliate of either has dealt with any finder or broker in connection with this Term Sheet or the proposed Loan or other financing of the Property." J.A. 234. This revised term sheet was signed by Jaramillo, Steve Duran, and David Duran on Railyard's behalf, and Thorofare Co-President and CEO Kevin H. Miller on September 5, 2014. J.A. 236.

As one of the conditions for completing the loan re-purchase, Thorofare required Railyard to settle its ongoing legal dispute with Allen Branch. To that end, Railyard and Allen Branch signed a settlement agreement on December 14, 2014 which released him from several obligations relating to Railyard, but not from his role as a guarantor of the MSRP/Ambit loan. J.A. 319.

On December 12, 2014, Thorofare and Railyard signed an Amended Promissory Note finalizing the re-purchase. J.A. 255. Jaramillo, David Duran, and Steve Duran signed a corresponding Recourse Guaranty, which included a clause pledging to "indemnify, defend and hold [Thorofare] (and any affiliate of [Thorofare]) harmless from any and all claims, losses, demands, actions or liabilities arising from or relating to any claim by any party for any fee or commission in connection with the making of the Loan." J.A. 317. By December 15, 2014,

7

Ambit had received payment for the loan re-purchase from Thorofare and the transaction documents had been recorded in New Mexico. J.A. 324.

After learning of the Railyard refinancing in January 2015, Red Star sent Thorofare a letter advising Thorofare of the Non-Circumvention Clause in the Red Star Agreement and asserting a right to $148,045 as a commission and a $2,995 consulting fee related to the re-purchase of the MSRP/Ambit loan. J.A. 351.

### E. Allen Branch's Relationship with Railyard

Although the record contains no evidence that Allen Branch remained in contact with Railyard or its members after May 2013 (other than through his lawsuit against the company), the nature of Allen Branch's legal relationship with Railyard from 2012 to 2015 is disputed. While he sold his voting interest and membership shares in the company in May 2012 and Railyard passed a resolution in January 2014 declaring that he was "not a member of Railyard Company LLC in any way," J.A. 207, Railyard's 2015 bankruptcy petition indicates that his membership interest in the company was not fully terminated until February 2015 and that he continued to serve as a guarantor of the MSRP/Ambit loan as of the date of the petition – September 9, 2015. Polao Decl. Ex. A.

## II. LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)). A fact is material if it might affect the outcome of the suit under the governing law, *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006), and "[a] genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor

of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-52 (1986)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26). In demonstrating that a genuine factual dispute exists, "the non-moving party must rebut the motion with facts in the record," *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006), and "may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016). While a court may not weigh evidence at the summary judgment stage, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*). In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment is warranted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

At this stage, all three Defendants seek summary judgment on all of Plaintiff's unresolved claims against them, and Thorofare also seeks summary judgment on its cross-claim and third-party claims against Jaramillo and the Durans for indemnification, including costs and attorneys' fees. The Court will turn first to Plaintiff's claims before evaluating whether Thorofare is entitled to indemnification.

### A. Red Star's Claims

Although Plaintiff has asserted several causes of action, its claims all rest on the premise that the refinancing of Market Station in 2014 falls within the scope of the Non-Circumvention Clause in the Red Star Agreement. Based on this premise, Plaintiff seeks these funds through state-law claims for breach of contract, unjust enrichment, *quantum meruit*, and conversion against Jaramillo and Allen Branch.[6] It has also asserted the same claims against Thorofare, except the breach of contract claim is replaced by a claim for tortious interference with contractual relations.

#### 1. Breach of Contract

Under Pennsylvania law, a breach of contract claim has three elements: "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). In interpreting the contract itself, "the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and

---

[6] As a federal court presiding over a case under diversity jurisdiction, the Court must apply the choice-of-law rules of the state in which it sits. *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 169 (3d Cir. 2005). "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tools, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (citing *Smith v. Commw. Nat'l Bank*, 557 A.2d 775, 777 (Pa. Super. Ct. 1989)). The Red Star Agreement contains a Pennsylvania choice of law provision, and the parties do not dispute that Pennsylvania law applies to all of Plaintiff's claims in this case.

when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). Only when the "'contract terms are ambiguous and susceptible of more than one reasonable interpretation'" is it permissible to consider "'extrinsic evidence, *i.e.*, parol evidence, to resolve the ambiguity.'" *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993).

### a. Allen Branch

Plaintiff argues that Allen Branch breached the Non-Circumvention Clause in the Red Star Agreement when Railyard obtained financing from Thorofare because, it claims, Allen Branch was acting on behalf of Railyard when he signed the Red Star Agreement. But this argument is undermined by the express terms of the Red Star Agreement. That agreement names "Allen Branch" and "Renaissance Properties LLC" as the Clients, and makes no mention of Railyard or any of Railyard's other members. Given this unambiguous language in the contract itself, the Court cannot consider parol evidence on this point and it would be unreasonable to conclude, based on the Red Star Agreement itself, that Railyard was a party to the agreement.

The fact that Railyard was not a party to the Red Star Agreement does not necessarily rule out the possibility that Allen Branch, acting through Railyard in 2014, could have personally breached the Red Star Agreement that he personally signed in 2013 because the Non-Circumvention Clause bars efforts to obtain commission-free financing "either directly or through third parties," and there is a lingering dispute over Allen Branch's affiliation with Railyard in 2014. But the factual record does not support this theory: There is no evidence that Allen Branch played any role in the efforts to obtain financing in 2014, even if he still held a small interest in Railyard at the time. Indeed, there is no evidence that he had any interaction

with Railyard in 2014 other than his own lawsuits against the company, or that he had any contact with Thorofare after his brief inquiry on behalf of Renaissance in 2013. Thus, even if Allen Branch benefitted from the loan re-purchase in the form of debt relief as a guarantor of the MSRP/Ambit loan, he was not involved in seeking the financing from Thorofare, and therefore did not breach the Red Star Agreement. Allen Branch's motion for summary judgment shall therefore be granted with respect to Plaintiff's breach of contract claim.

### b. Jaramillo

As the Supreme Court of Pennsylvania has noted, "'it is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract.'" *Meyer*, 137 A.3d at 1258 (quoting *Electron Energy Corp.*, 597 A.2d 175, 177 (Pa. Super. Ct. 1991)). Jaramillo was not a party to the Red Star Agreement, and Plaintiff's effort at enforcing the contract against Jaramillo through his role with Railyard is unavailing since, as noted above, Railyard was also not a party to the contract. Since Jaramillo was not a party to the Red Star Agreement, his motion for summary judgment shall therefore be granted with respect to Plaintiff's breach of contract claim against him.

### 2. Unjust Enrichment / *Quantum Meruit*

Although Plaintiff has pled separate counts for unjust enrichment and *quantum meruit*, the claims are synonymous under Pennsylvania law. *See Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 666 (Pa. Super. Ct. 2007). The claim, however it is labeled, requires proof of "'(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008) (quoting

*Limbach Co. LLC v. City of Phila.*, 905 A.2d 567, 575 (Pa. Commw. Ct. 2006)). In evaluating a claim for unjust enrichment or *quantum meruit*, the "focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Mitchell v. Moore*, 729 A.2d 1200, 1204 (Pa. Super. Ct. 1999) (internal quotation marks omitted). In other words, "'a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for [it] to retain.'" *Sovereign Bank*, 533 F.3d at 180 (quoting *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985).

Although the standards for evaluating an unjust enrichment / *quantum merit* claim are fact-specific, the claim is categorically "inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) (citing *Third Nat'l & Trust Co. of Scranton v. Lehigh Valley Coal Co.*, 44 A.2d 571, 574 (Pa. 1945)). This "bright-line rule . . . embodies the principle that parties in contractual privity . . . are not entitled to restitution based upon the doctrine of unjust enrichment because the terms of their agreement (express and implied) define their respective rights, duties, and expectations." *Id.* (internal quotation marks and modifications omitted).

### a. Allen Branch

Allen Branch argues that Plaintiff's unjust enrichment and *quantum meruit* claims against him fail because the claims arise from a relationship governed by an express contract. Plaintiff attempts to evade this conclusion by noting that there was no contract between Plaintiff and Thorofare.[7] But the relevant contract here is the Red Star Agreement between Plaintiff, Allen Branch, and Renaissance. This agreement serves as the basis for the alleged "inequity" created

---

[7] This argument appears to have originated in Plaintiff's brief opposing Thorofare's motion for summary judgment, but Plaintiff also included it in its brief opposing Allen Branch's motion. Although the lack of a contract between Plaintiff and *Thorofare* has no apparent relevance to the claim against Allen Branch, Plaintiff has not offered an alternative argument in opposition to Allen Branch's motion.

by excluding Plaintiff from the refinancing of Market Station. Since Plaintiff's claim is based on the rights established by a contract it signed with Allen Branch, that contract alone defines Plaintiff's right to a commission and consulting fees from Allen Branch, and those fees cannot serve as the basis for an unjust enrichment or *quantum meruit* claim against him. Allen Branch's motion for summary judgment shall therefore be granted with respect to Plaintiff's unjust enrichment and *quantum meruit* claims against him.

b. **Jaramillo**

Plaintiff's unjust enrichment and *quantum meruit* claims against Jaramillo are based on the premise that, but for Plaintiff's introduction of "the Branch Defendants" (*i.e.*, Allen Branch, Renaissance, Branch Realty, and Jaramillo) to Thorofare in August 2013, the refinancing of Market Station would not have occurred. Jaramillo disputes this premise and contends that he was not introduced to Thorofare by Red Star in 2013, but instead learned about Thorofare through a real estate periodical in the summer of 2014.

The record supports Jaramillo's account, and contains no support for Plaintiff's contention that it introduced Jaramillo or Railyard to Thorofare. By the time Plaintiff introduced Allen Branch to Thorofare in August 2013, Allen Branch was acting on behalf of Renaissance and himself – not Railyard or its other members. In fact, by all Defendants' accounts, the relationship between Railyard and Allen Branch had deteriorated so much by May 2013 that Allen Branch did not communicate with Railyard or its remaining members outside of his lawsuit against them. Plaintiffs have offered no evidence to rebut this account or to otherwise show that Allen Branch had any meaningful relationship with Railyard by July and August 2013 when he re-engaged with Plaintiff and was introduced to Thorofare.

14

Although it is unclear if Allen Branch made his separation from Railyard clear to Plaintiff, the Red Star Agreement identified only Allen Branch and Renaissance as "Clients" bound by the terms of the agreement. Neither Railyard, nor any of its remaining members are mentioned in the agreement nor is there any evidence that they communicated with Plaintiff after July 2013. Jaramillo's motion for summary judgment shall therefore be granted with respect to the unjust enrichment and *quantum meruit* claims against him.

### c. Thorofare

Plaintiff's unjust enrichment and *quantum meruit* claims against Thorofare rest on the same factual premise as its claims against Jaramillo: that Plaintiff introduced Thorofare to Railyard. Like Jaramillo, Thorofare responds that the loan to Railyard in 2014 had no relation to any efforts Plaintiff made to arrange financing for Allen Branch and Renaissance the previous year, but was instead the result of entirely separately efforts by Jaramillo to secure financing for Railyard.

Again, the record supports Thorofare's account and contains no evidence to support Plaintiff's allegations. By the time Plaintiff introduced Thorofare to Allen Branch in 2013, Allen Branch was acting on behalf of Renaissance, not Railyard, and there is no evidence that Thorofare was put in touch with Railyard or any representative of Railyard through Plaintiff's efforts. Furthermore, Thorofare's brief involvement with Plaintiff and Allen Branch in 2013 consisted of preliminary negotiations involving a Thorofare representative who was no longer employed by Thorofare when Jaramillo inquired about refinancing for Railyard the following year. Thus, although Plaintiff generally disputes Thorofare's and Jaramillo's account, they have not adduced any specific evidence that Thorofare's transaction with *Railyard* in 2014 had any relation to Plaintiff's introduction of Thorofare to *Renaissance* and Allen Branch the prior year.

15

Thorofare's motion for summary judgment shall therefore be granted with respect Plaintiff's unjust enrichment and *quantum meruit* claims against it.

3.  **Conversion**

Under Pennsylvania law, "conversion is the deprivation of another's right of property in, or use of possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964). "Money may be the subject of a conversion only where the plaintiff had a property interest in the money at the time of the alleged conversion." *Kia v. Imaging Sciences Int'l, Inc.*, 735 F. Supp. 2d 256, 270 (E.D. Pa. 2010). For this reason, the failure to pay a debt is not conversion, while the failure to distribute money to which a plaintiff has a legal property interest (established by contract or otherwise) may constitute conversion. *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 878-79 (Pa. Super. Ct. 1997).

Plaintiff has not shown a property interest in the commission or consulting fees that would be recognized under Pennsylvania law as the subject of conversion. Although the Pennsylvania Superior Court recognized a lawyer's referral fee as the potential subject of conversion in *Needleman*, that conclusion rested on the fact that the client had already paid the money from which the fee was to be deducted. Only after the money had been paid by the client and held by the attorney who performed the legal work did it constitute a specific piece of property to which the referring attorney had a property right. *See Needleman*, 705 A.2d at 879 ("[O]nce a fee has been received, the referral fee can be the subject of a conversion."). In this case, the Red Star Agreement does not entitle Plaintiff to a portion of any loan proceeds – which would be analogous to the fee at issue in *Needleman* – but rather creates a separate right to payment of funds that do not yet exist. Since the commission and fees outlined in the Red Star

16

Agreement are not part of an already-existing set of funds, the unpaid commission cannot be the subject of conversion. All Defendants' motions for summary judgment shall therefore be granted with respect to Plaintiff's conversion claim.

### 4. Tortious Interference with Contractual Relations

Plaintiff's tortious interference with contractual relations claim is asserted only against Thorofare and is based on the premise that Thorofare provided financing directly to Railyard to allow other Defendants to avoid paying a commission under the Red Star Agreement. Pennsylvania has adopted the Restatement (Second) of Torts to define tortious interference with a contractual relationship, which establishes four elements to the claim:

(1) The existence of a contractual relationship between the complainant and a third party;

(2) An intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;

(3) The absence of privilege or justification on the part of the defendant; and

(4) The occasioning of actual damage as a result of defendant's conduct.

*Phillips v. Selig*, 959 A.2d 420, 429 (Pa. Super. Ct. 2008); *see Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1181-83 (Pa. 1978); *see also U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 925 n.12 (3d Cir. 1990) (noting that Pennsylvania had adopted the Restatement (Second) of Torts § 766 while the Restatement remained in draft form, but that the final language is substantially the same and accurately sets forth the law of Pennsylvania).

The second element of tortious interference with contractual relations – intent to harm the plaintiff by interfering with the contract – requires "[a]ctual knowledge of the contract with which a defendant supposedly interfered." *Mylan, Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013) (citing Restatement (Second) of Torts § 766 cmt. i (1979) (requiring that

a party "have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract")). Thus, to succeed on its tortious interference with contractual relations claim against Thorofare, Plaintiff must show that Thorofare not only knew about the Red Star Agreement, but also knew that providing financing without a commission to Plaintiff would interfere with the agreement. But the record contains no evidence that Thorofare knew about the Red Star Agreement at all. Plaintiff has therefore failed to identify an evidentiary basis to reasonably support its tortious interference with contractual relations claim, and Thorofare's motion for summary judgment shall be granted with respect to that claim.

### B. Thorofare's Cross-Claims and Third-Party Claims

Thorofare has asserted a cross-claim against Jaramillo and third-party claims against Steve Duran and David Duran seeking indemnification, attorneys' fees, and costs related to defending against Plaintiff's claims, based on the indemnification clause in the Recourse Guaranty that accompanied Thorofare's loan to Railyard. Under Arizona law, which governs the Recourse Guaranty pursuant to a choice-of-law provision, an indemnification agreement containing a "hold harmless" provision "allow[s] an indemnitee to recover its defense costs if a claim was made against it that entitle[s] it to indemnification." *MT Builders, L.L.C. v. Fisher Roofing*, 197 P.3d 758, 767 (Ariz. Ct. App. 2008). This right to recover the costs of defending against the claim accrues "regardless of whether the indemnitee is ultimately held not liable." *INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.*, 722 P.2d 975, 982 (Ariz. Ct. App. 1986) (internal quotation marks omitted).

The clause in the Recourse Guaranty upon which Thorofare's claim is based provides that Jaramillo, Steve Duran, and David Duran will "indemnify, defend and hold [Thorofare]

harmless from any and all claims, losses, demands, actions or liabilities arising from or relating to any claim by any party for any fee or commission in connection with the making of the Loan." Since Plaintiff's claims against Thorofare involve a "fee or commission" related to the 2014 Railyard refinancing, the claims fall within the scope of the Recourse Guaranty's indemnification clause, and Thorofare is entitled to reimbursement from Jaramillo and the Durans for the attorneys' fees and other costs it expended to defend itself against Plaintiff's claims in this case. Thorofare's motion for summary judgment shall therefore be granted with respect to its indemnification claims against Jaramillo, Steve Duran, and David Duran.

An order follows.

Dated: August 21, 2017

                                              **BY THE COURT:**

                                              **/s/Wendy Beetlestone, J.**

                                              _____

                                              **WENDY BEETLESTONE, J.**